# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

K. VIRGINIA HEMBY-GRUBB, Ph.D.,  )
                                  Plaintiff,   )

v.   )   2:06cv1307
   )   **Electronic Filing**
INDIANA UNIVERSITY OF
PENNSYLVANIA and ROBERT C.
CAMP, Ph.D.,

                                 Defendants.

## MEMORANDUM OPINION

September 22, 2008

### I. INTRODUCTION

In this memorandum opinion, the court considers the motion for summary judgment (Docket No. 34) filed by defendants Indiana University of Pennsylvania ("IUP") and Robert C. Camp, Ph.D. ("Dean Camp")(together with IUP, "defendants") requesting summary judgment foreclosing all claims advanced by K. Virginia Hemby-Grubb, Ph.D. ("Dr. Hemby-Grubb" or "plaintiff") under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§951 *et seq.* in her first amended complaint (Docket No. 9). After considering the briefs in support and in opposition to the motion, together with the statements of material facts and appendices submitted by the parties, and based upon the undisputed facts of record, and all reasonable inferences drawn in favor of plaintiff, defendant's motion for summary judgment will be granted.

### II. STATEMENT OF THE CASE

Dr. Hemby-Grubb was hired as an Assistant Professor by IUP in August 1995. Defendants' Concise Statement of Material Facts ("DSOF") ¶6. IUP is a member university of Pennsylvania's State System of Higher Education ("SSHE") DSOF ¶7. IUP has a Technology Support and Training Department ("TST") in its College of Business and Information Technology ("College of Business"). DSOF ¶8. Dean Camp has been the Dean of the College of Business since 1988 and is responsible for management of its academic and service programs.

DSOF ¶9. The chairperson of the TST Department is Dr. Linda Szul ("Dr. Szul") whose duties include, *inter alia*, acting as liaison between both students and faculty and faculty and the dean. DSOF ¶10. Dr. Szul has served in such capacity since May 2002. DSOF ¶11. Helen M. Kennedy ("Ms. Kennedy") works in IUP's Human Resources Department, and served as the ADA coordinator during the time period relevant to this lawsuit. DSOF ¶¶12-14. As ADA coordinator, Ms. Kennedy was responsible for overseeing the process of and making decisions on ADA accommodation requests. DSOF ¶¶15-16.

IUP professors are subject to a collective bargaining agreement, under which they are required to maintain twenty-four credits each academic year. DSOF ¶18.

On December 1, 1999, Dr. Hemby-Grubb was walking to class on campus when she was suddenly and unexpectedly struck by a motor vehicle. Plaintiff's Concise Statement of Material Facts ("PSOF") ¶1. As a result of the accident, Dr. Hemby-Grubb suffered serious closed head injuries as well as other injuries. PSOF ¶2. She was also diagnosed with Post Traumatic Stress Disorder ("PTSD") following the accident. PSOF ¶3. Dr. Hemby-Grubb has regularly treated with a mental health professional since the accident. PSOF ¶¶4-6. In addition to PTSD, Dr. Hemby-Grubb has been diagnosed with mood disorder due to head trauma, dementia due to head trauma, impairment to cognitive functioning, anxiety and depression. PSOF ¶¶7-9. Dr. Hemby-Grubb returned to work in September 2000 on a "research release" and taught a limited schedule in the spring 2001 semester. DSOF ¶21. IUP granted Dr. Hemby-Grubb full tenure in June 2001. DSOF ¶22.

Dr. Hemby-Grubb taught a course load of nine credits in the Fall 2001 semester, and was granted three credit hours for research release. DSOF ¶23. Plaintiff taught a full course load of twelve credits in the Spring 2002 semester, which included a three credit-hour on-line course. DSOF ¶24.

In June 2002, Dr. Hemby-Grubb began treating with Dr. Carolyn J. Menta ("Dr. Menta"), a psychologist, for disorders resulting from the accident. PSOF ¶12. On June 25, 2002, Dr. Menta wrote to Dr. Szul expressing the difficulties Dr. Hemby-Grubb had in managing her workload, particularly with respect to teaching the on-line course in Spring 2002, and suggested

that it would be detrimental to Dr. Hemby-Grubb's mental health were she to again teach the on-line course. DSOF ¶25. In the Fall semester of 2002, the on-line course was taught by faculty other than Dr. Hemby-Grubb. DSOF ¶31. Dr. Hemby-Grubb carried nine credits for teaching courses and three credits for a research release during that Fall semester. DSOF ¶37.

The following spring semester, Dr. Hemby-Grubb had ten hours of teaching credits and two credits for research release. DSOF ¶38. Dr. Menta again wrote Dr. Szul on January 21, 2003, detailing Dr. Hemby-Grubb's progress and improved conditions, but noted that Dr. Hemby-Grubb was feeling "overwhelmed" with a new semester starting . DSOF ¶¶39-43. Dr. Menta further offered that she encouraged Dr. Hemby-Grubb to follow up with Dr. Szul and that "with . . . some basic limitations on her work-related responsibilities, Dr. Hemby[-Grubb] is capable of performing at a very high level in the work place." DSOF ¶45.

On June 4, 2003, Dr. Menta wrote to IUP's Human Resources Department detailing Dr. Hemby-Grubb's difficulties with her work responsibilities, particularly the previous semester. DSOF ¶58. Dr. Menta's letter asserts that, based upon her recommendation, Dr. Hemby-Grubb had requested a reduction in her course load, but the request had not been granted. DSOF ¶61.

On July 1, 2003, Dr. Hemby-Grubb spoke with Ms. Kennedy about obtaining an ADA request form and the process was explained to Dr. Hemby-Grubb by Ms. Kennedy at that time, which included explaining the requirement of supplying medical information and working with the treating physician. DSOF ¶¶66-67. Ms. Kennedy mailed the form and other necessary information, and Dr. Hemby-Grubb selected the date of July 29, 2003, for a meeting. DSOF ¶¶69-70. On July 3, 2003, Ms. Kennedy received an ADA Accommodation Request form and letter attachment from Dr. Hemby-Grubb. DSOF ¶73. Dr. Hemby-Grubb did not submit supporting medical documentation with the form, but suggested as accommodations that IUP hire her husband as a tenured faculty member, permanently reduce her teaching requirements to three courses in the fall semester and two courses in the spring semester, or retire her on disability at 75% of her salary plus benefits until 2028. DSOF ¶75. Plaintiff had scheduled foot surgery on September 5, 2003, with an expected recovery period of 8 to 10 weeks, and therefore cancelled the meeting she had scheduled with Ms. Kennedy. DSOF ¶¶86-88.

3

In August 2003, Dr. Hemby-Grubb retained legal counsel to represent her in her ADA accommodation request. DSOF ¶92. Dr. Hemby-Grubb's attorney at the time, Theresa Wasser ("Ms. Wasser"), wrote a letter to Dr. Szul on September 25, 2003, concerning the accommodation request and Dr. Hemby-Grubb's teaching schedule for the Spring 2004 semester. DSOF ¶93. IUP's counsel, Todd Brownfield ("Mr. Brownfield"), responded to Ms. Wasser's letter by letter of October 27, 2003, requesting medical documentation of Dr. Hemby-Grubb's disability. PSOF ¶¶29-30. On November 18, 2003, Dr. Hemby-Grubb, Ms. Wasser, Mr. Brownfield and Ms. Kennedy had a meeting to discuss Dr. Hemby-Grubb's accommodation request. PSOF ¶¶32-33. At the meeting, Mr. Brownfield again requested medical documentation concerning Dr. Hemby-Grubb's disability. DSOF ¶109. Dr. Hemby-Grubb reiterated her request for a permanent reduction in her course load at the meeting. DSOF ¶111. Dr. Hemby-Grubb did not return to work at IUP for the remainder of the semester on Dr. Menta's recommendation. DSOF ¶¶114, 116. Mr. Brownfield again requested medical documentation of Dr. Hemby-Grubb's disability by way of e-mail to Ms. Wasser on November 19, 2003. DSOF ¶117. Mr. Brownfield reiterated his request by way of letter to Ms. Wasser on December 23, 2003. DSOF ¶119.

On October 14, 2003, Dr. Hemby-Grubb wrote a letter to Middle Tennessee State University ("MTSU") applying for a faculty position. DSOF ¶99.

On December 29, 2003, Dr. Hemby-Grubb advised a colleague that she would be out of town until January 6 or 7. PSOF ¶37. Dr. Wayne Moore scheduled a faculty meeting for professors of a course on Dr. Hemby-Grubb's schedule for January 5, 2004, despite being notified by the colleague that Dr. Hemby-Grubb would be out of town on that date. PSOF ¶¶37-39.

In the Spring 2004 semester, Dr. Hemby-Grubb was scheduled to teach four classes for nine credits and had three credits of research release. DSOF ¶122. On January 8, 2004, Dr. Hemby-Grubb e-mailed Dr. Szul questioning the credit allotment for three lab courses she was teaching. DSOF ¶123. On January 19, 2004, a medical leave form was submitted for Dr. Hemby-Grubb by Dr. Stahley-Lake, a psychologist, indicating that Dr. Hemby-Grubb would be

absent from work from January 20, 2004 until January 23, 2004, "due to significant stress," and also noted that Dr. Hemby-Grubb's current work schedule was causing her "increased psychological distress." DSOF ¶¶127-128. In spite of this, Dr. Hemby-Grubb interviewed for the MTSU position on or about January 23, 2004. DSOF ¶134.

In early February 2004, a colleague informed Dr. Hemby-Grubb that Dr. McPherson, a tenured TST Department professor, advised her to stay away from Dr. Hemby-Grubb if she wanted to obtain tenure at IUP. PSOF ¶46. Dr. McPherson did not respond to an e-mail from Dr. Hemby-Grubb inquiring about the comment. PSOF ¶47.

On February 11, 2004, Dean Camp sent an e-mail to Dr. Hemby-Grubb regarding various faculty and student concerns about her performance that were brought to his attention by Dr. Szul. DSOF ¶¶138-141. The e-mail message was also transposed into a memorandum and placed in Dr. Hemby-Grubb's department mailbox. DSOF ¶142. Dr. Hemby-Grubb responded to Dean Camp's e-mail slightly more than an hour after its transmission. PSOF ¶55. Dean Camp responded to Dr. Hemby-Grubb's reply on February 13, 2004, after conferring with Dr. Szul and Ms. Kennedy. PSOF ¶56.

By letter of February 12, 2004, Dr. Hemby-Grubb was notified by MTSU that she was being recommended for a faculty position as an associate professor, and she accepted the terms by signing the letter on February 18, 2004. DSOF ¶¶162-163. Dr. Hemby-Grubb executed a contract with MTSU on March 26, 2004. DSOF ¶173.

On March 17, 2004, Dr. Hemby-Grubb communicated to Dr. Szul that she "had a gall bladder attack" and that she was scheduled to meet with a surgeon on March 29, 2004 at 3:30 p.m. DSOF ¶168. Dr. Hemby-Grubb informed Dr. Szul that she would not be able to teach on March 24, 2004 due to illness. DSOF ¶170. Dean Camp e-mailed Dr. Hemby-Grubb on March 25, 2004, about concerns raised by students and faculty regarding her absences. DSOF ¶172. Dr. Szul sent an e-mail to Dean Camp and Ms. Kennedy on March 29, 2004, notifying them that Dr. Hemby-Grubb had not met her 3:30 class. PSOF ¶59. On March 30, 2004, Dr. Menta wrote Mr. Brownfield and Ms. Kennedy regarding her concerns about Dr. Hemby-Grubb's mental condition. PSOF ¶61. Dean Camp e-mailed Dr. Hemby-Grubb on March 31, 2004, again

5

concerning absences. DSOF ¶181. Dr. Menta requested medical leave for Dr. Hemby-Grubb from April 1, 2004 for the remainder of the spring 2004 semester. PSOF ¶62. Ms. Kennedy wrote a letter to Dr. Hemby-Grubb on April 14, 2004, notifying her that her medical leave had been approved. PSOF ¶63. By letter of July 26, 2004, Dr. Hemby-Grubb requested an unpaid two-year leave of absence from IUP. PSOF ¶64. IUP approved the leave of absence request by letter of August 17, 2004. PSOF ¶65. Dr. Hemby-Grubb did not advise IUP that she had accepted a position with MTSU, nor did she advise MTSU that she had taken a leave of absence from IUP. DSOF ¶¶203-204. The medical documentation of Dr. Hemby-Grubb's disability requested by Mr. Brownfield was never received by IUP. DSOF ¶206.

Dr. Menta wrote a letter to MTSU on August 30, 2004 because Dr. Hemby-Grubb wanted the letter to be "on file," but not because Dr. Hemby-Grubb was requesting an accommodation. DSOF ¶257. For her first two semesters at MTSU, Dr. Hemby-Grubb taught four courses for twelve credits. DSOF ¶¶258-259. At the end of the Spring 2006 semester Dr. Hemby-Grubb requested, and MTSU granted, an accommodation in the form of reducing Dr. Hemby-Grubb's course load to three classes per semester. DSOF ¶¶268-269.

Dr. Hemby-Grubb resigned from IUP by letter of April 29, 2006. PSOF ¶66. Dr. Hemby-Grubb's resignation, effective May 31, 2006, was acknowledged by Ms. Kennedy on June 2, 2006. DSOF ¶282.

Plaintiff filed a complaint with this court on September 29, 2006, alleging violations of the ADA and the PHRA against defendants. Defendants filed a motion to dismiss on December 6, 2006, and plaintiff then filed her first amended complaint on December 22, 2006. Defendants filed a motion to dismiss the amended complaint on January 9, 2007, and the parties submitted briefs. The matter was referred to mediation, which was held on March 16, 2007, and revealed that settlement had not been reached. Defendants motion to dismiss was denied on July 9, 2007, and defendants filed their answer and affirmative defenses on July 30, 2007. Defendants filed a motion for summary judgment and supporting documents on October 24, 2007. Plaintiff responded on November 26, 2007, and defendant replied on December 3, 2007.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id*.

### IV. DISCUSSION

Plaintiff's amended complaint contains four counts asserting claims of failure to make reasonable accommodations and retaliation under both the ADA and PHRA. Count I charges IUP with failure to make a reasonable accommodation under Title II of the ADA, 42 U.S.C. § 12132. Count II is brought against IUP and Dean Camp in his official capacity and alleges retaliation under Title V of the ADA, 42 U.S.C. § 12203. Count III asserts failure to make a reasonable accommodation against IUP under the PHRA, 43 P.S. § 955(a). Count IV, against

7

IUP and Dean Camp in his official capacity, claims retaliation under the PHRA, 43 P.S. § 955(d).

Plaintiff's claim in Count I is premised on IUP's alleged failure to accommodate her mental disabilities following her accident by either hiring her husband as a tenured faculty member, permanently reducing the number of courses she was required to teach each semester, or retiring her on 75% salary and full benefits. Plaintiff brings her claim under Title II of the ADA presumptively because the United States Supreme Court, in *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356 (2001), held that private litigants were precluded by the Eleventh Amendment from maintaining actions for money damages against a state under Title I of the ADA. *Id*. at 374. Title I of the ADA specifically addresses discrimination in the employment context. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The court is therefore tasked in the first instance to decide whether an employment discrimination claim is even cognizable under Title II of the ADA.

The Third Circuit has yet to squarely address the issue. There is a split in the Circuits before whom the question has come. In *Zimmerman v. Or. Dep't of Justice*, 170 F.3d 1169 (9th Cir. 1999), the Ninth Circuit held that Title II does not apply to employment claims. *Id*. at 1184. Conversely, in *Bledsoe v. Palm Beach County Soil & Water Conserv. Dist.*, 133 F.3d 816 (11th Cir. 1998), the Eleventh Circuit held that it does. *Id*. at 820.

The district courts in this Circuit likewise have been inconsistent. Compare *Nelson v. Pa. Dep't of Pub. Welfare*, 244 F.Supp.2d 382, 388-89 (E.D. Pa. 2002) (Title II not intended to provide cause of action for employment discrimination); *Koslow v. Pennsylvania*, 158 F.Supp.2d 539, 542 (E.D. Pa. 2001) (Congress intended Title I to be the sole avenue for pursuing employment discrimination claims based on disability"), *aff'd in part, rev'd on other grounds*, 302 F.3d 161 (3d Cir. 2002); with *Bracciale v. City of Philadelphia*, 1997 WL 672263, *7 (E.D. Pa. Oct. 29, 1997) ("Title II covers employment discrimination by a public entity"); *Benedum v. Franklin Tp. Recycling Center*, 1996 WL 679402, *5 (W.D. Pa. Sept. 12, 1996) ("Although not expressly stated in § 12132, regulations adopted by the Department of Justice establish that Title

II's prohibitions against discrimination by public entities includes employment discrimination").

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Garrett*, 531 U.S. at 360 n.1 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1982)). "Further, when interpreting a statute, a court must look to every word and clause to give full effect to the entire statute. If possible, no provision should be read as 'superfluous, void, or insignificant.'" *Pennsylvania State Troopers Ass'n v. Pennsylvania*, 2007 WL 853958, *7 (M.D. Pa. March 20, 2007) (quoting *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001)). "When interpreting statutory language, the Third Circuit has directed that 'words in a statute should be given their ordinary meaning whenever possible.'" *McSherry v. Department of Labor & Industry*, 2006 WL 463157, *9 (M.D. Pa. Feb. 23, 2006) (quoting *Okeke v. Gonzalez*, 407 F.3d 585, 593 (3d Cir. 2005)).

Based upon the sound and persuasive reasoning in *Zimmerman*, the structure of the ADA, and the ordinary meaning of the words "services," "programs," and "activities," the Court concludes, after careful consideration, that Congress did not contemplate the maintenance of an employment discrimination action under Title II of the ADA. It would seem to be a tortured reading of the ADA as a whole to construe that after covering employment in Title I, Title II likewise was intended to encompass employment actions without explicitly saying so. Neither can it be said that employment is a natural correlative of "services," "programs," or "activities."

Proponents of the antithetical position, that employment discrimination is actionable under Title II, often point to 28 C.F.R. § 35.140 established by the Department of Justice and stating in relevant part:

> No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity.

28 C.F.R. § 35.140(a).

Under the doctrine announced in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), however, agency regulations such as these are only entitled to deference

9

when Congress has not spoken directly to the precise question at issue and the agency's regulation is based upon a reasonable interpretation of the statute. *Chevron*, at 842-44. In *Zimmerman*, the court held that "Congress unambiguously expressed its intent for Title II not to apply to employment," *Id*. at 1173. Adopting this reasoning effectively ends the inquiry. *Chevron* at 842.

In light of the foregoing analysis, therefore, summary judgment will be granted to defendants on Count I of plaintiff's amended complaint.

Count II of plaintiff's amended complaint alleges retaliation in violation of Title V of the ADA, 42 U.S.C. § 12203, against IUP and Dean Camp. Defendants argue that the claim should be dismissed because they are entitled to immunity under the Eleventh Amendment. Neither the United States Supreme Court nor the Third Circuit have confronted the issue of Eleventh Amendment immunity under Title V of the ADA. Other courts facing the issue have reached divergent conclusions. Due to the dearth of precedent available and the parties relatively cursory treatment of the issue in their briefs, the court chooses not to address the issue here, and limit the discussion to the merits of the claim.

In order to establish a *prima facie* case for retaliation under the ADA, a plaintiff must establish that there was "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). Additionally, in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) the Supreme Court held that employer actions are materially adverse if the actions are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. If a plaintiff is able to establish a *prima facie* case, the burden of production then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991), *cert. denied* 502 U.S. 940 (1991). The burden then shifts back to the plaintiff who then must show that the proffered reason is pretextual. *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986).

Although plaintiff is able to establish that she engaged in protected activity, which the parties concede, that being the accommodation request under the ADA and retention of counsel pursuant thereto, she fails to adduce sufficient evidence that IUP or Dean Camp took adverse action against her or that there was a causal connection between the protected activity and the alleged adverse action.

Plaintiff claims that the adverse action she was subjected to by IUP and Dean Camp was defendants' retaliatory conduct consisting of a credit allotment dispute for teaching a two-hour lab course, being the only faculty member of the TST department required to teach four classes in the Spring 2004 semester, a comment made to one of plaintiff's colleagues by a tenured TST department professor, and certain "inaccurate and derogatory" e-mails being sent as well as being reduced to hard copy and being placed in plaintiff's department mailbox, all of which forced her to resign from her tenured position at IUP and accept a non-tenured position at MTSU.

Addressing "material adversity," the Supreme Court has held that "trivial harms . . . petty slights, minor annoyances, and simple lack of good manners will not create such deterrence [to dissuade a reasonable worker from making or supporting a charge of discrimination]." *Burlington Northern*, 548 U.S. at 68. Additionally, "[t]he anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.

The Court can not conclude on this record that any of the alleged retaliatory conduct attributed to defendants constituted adverse action, or that such conduct was causally connected to plaintiff's protected activity. With respect to the allegation that two credits were allotted to the two-hour lab course that plaintiff taught instead of the three credits plaintiff avers had been previously allotted per some agreement between the faculty and the Dean, this was a provision that applied to all faculty teaching that course, not just plaintiff, and, therefore, is not discriminatory by definition. Neither can the Court accept, and plaintiff has adduced no evidence for the Court to find otherwise, that the credit allotment was somehow causally connected to plaintiff's protected activity. The Court likewise can not conclude that the averment that plaintiff was the only TST faculty member required to teach four classes in the Spring 2004 semester was retaliatory in light of the fact that the record makes clear that IUP bases course scheduling on

11

number of credits as opposed to number of classes, and plaintiff has adduced no evidence to show that she was the only TST faculty member to carry twelve credits in the Spring 2004 semester as required by the applicable collective bargaining agreement. The argument that this was retaliatory because plaintiff had requested fewer classes as opposed to fewer credits as a proposed ADA accommodation is unavailing. The ADA accommodation process had not been completed by that point and defendants were without sufficient information to determine whether an accommodation was warranted.

Dr. McPherson's comment to Dr. Willis that Dr. Willis should avoid plaintiff if she wished to remain at IUP and gain tenure lacks adequate support in the record, is insufficient to satisfy the "materially adverse" standard articulated above, and, if made, qualifies as a stray remark by a non-decisionmaker and not entitled to great weight. See *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).

Finally, turning to the e-mails and memorandum plaintiff alleges were generated in retaliation to plaintiff's protected activity, specifically the January 8, 2004 e-mail from Dr. Szul to plaintiff and the February 11, 2004 e-mail and identical memorandum from Dean Camp to plaintiff, once again the court finds these communications not to be materially adverse. The Court can not discern what content in the January 8, 2004 e-mail from Dr. Szul to plaintiff could reasonably be construed as retaliatory. Despite plaintiff's characterization of the e-mail as unusual, her suggestion that it creates an inaccurate scenario of plaintiff's non-attendance of a faculty meeting, and her argument that it was sent only to create a paper trail of plaintiff's alleged wrongdoing, it is clear that, with the semester starting in only four days, Dr. Szul was merely seeking assurance that plaintiff would be assuming her teaching responsibilities. There is nothing in the communication that suggests an adverse action of any kind, and plaintiff's speculation that it was generated to create a "paper trail" is insufficient for a finding that her receipt of this e-mail was materially adverse to the extent that she would be dissuaded from pursuing her ADA accommodation request.

Further, Dean Camp's e-mail of February 11, 2004, addressed concerns of faculty and students regarding plaintiff, and nothing in its content can fairly be read as "harassing" or

retaliatory. As Dean of the Business College, it was his duty to address these concerns. It threatens no disciplinary action, or any adverse consequences in any way. The mere fact that it was also reduced to hard copy and placed unsealed in plaintiff's department mailbox, "to ensure that his words would cause [plaintiff] the greatest possible embarrassment and humiliation" is pure speculation and, again, insufficient to constitute materially adverse action. Even taken in the aggregate, this collection of innocuous acts is insufficient for the court to conclude that a level of material adversity was reached that would dissuade a reasonable person from making or supporting a claim of discrimination. Moreover, to the extent plaintiff claims that her "involuntary" resignation constitutes a constructive discharge, the Court finds that plaintiff has failed to demonstrate that "the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887-88 (3d Cir. 1984).

Additionally, there is insufficient evidence to suggest that these acts were causally connected to plaintiff's ADA request. While the court notes that the first allegedly retaliatory incident occurred approximately three months after IUP received plaintiff's attorney's initial letter, and the court acknowledges that in some situations temporal proximity is sufficient by itself to establish a causal link, see, e.g., *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003), the court does not find that to be the case here. See *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 759-61 (3d Cir. 2004) (finding two month period between protected activity and alleged adverse action insufficient to establish causation). When temporal proximity is not alone sufficient to justify an inference of causation, other evidence must be examined to evaluate causation. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000). Such other evidence is not present here.

Therefore, defendants' motion for summary judgment will be granted as to Count II of plaintiff's first amended complaint.

Count III of plaintiff's first amended complaint alleges failure to make a reasonable accommodation in violation of the PHRA, 43 P.S. § 955(a) against IUP. The gravamen of the

claim is that IUP failed to offer her a permanent reduction in the number of classes she was required to teach per semester as a reasonable accommodation for her disability resulting from her December 1, 1999 accident, which resulted in her resignation from her tenured position at IUP and acceptance of a non-tenured position at MTSU. Plaintiff also suggested as reasonable accommodations that IUP hire her husband to a tenured faculty position or that she be retired on 75% of her salary plus full benefits.

"In order to make out a *prima facie* case of disability discrimination under the ADA and PHRA, a plaintiff must establish that s/he (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002) (citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (footnote omitted).

The first task under this rubric, then, is to determine if plaintiff is a qualified individual with a disability. In *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999), the Third Circuit stated:

> A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Id.* at 305-306 (alteration in original).

Noteworthy for purposes of this claim, the Court observes that, "[b]efore turning to the first issue, whether [plaintiff] has a disability under the ADA, we mention that we will only discuss [plaintiff]'s ADA claim because our analysis of an ADA claim applies equally to a PHRA claim." *Id.* at 306 (citing *Kelly v. Drexel University*, 94 F.3d 102, 105 (3d Cir. 1996)).

Plaintiff asserts that her mental impairment substantially limits the major life activity of thinking. It is beyond peradventure that thinking qualifies as a major life activity. The EEOC regulations define "substantially limits" as, *inter alia*, "(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life

14

activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The following factors are considered in determining substantial limitation in a major life activity: "(I) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2). In *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S.184 (2002), the Supreme Court noted that the persuasive authority of EEOC regulations interpreting the term "disability" in the ADA is unclear, but assumed without deciding that the regulations are reasonable. Because both parties cite the regulations in their briefs without objection, this Court will make the same assumption here.

There is ample evidence in the record to suggest that plaintiff's cognitive functioning is at least equal, if not superior, to that of the average person in the general population, including: (1) her ability to teach at the college level; (2) plaintiff's involvement in numerous professional associations; (3) her scholarly publishing activity; and (4) the fact that she was able to apply, interview for and secure a tenure track faculty position at another university during the time she was seeking an accommodation from IUP. Nonetheless, taking all reasonable inferences in the light most favorable to plaintiff, the Court accepts that the five letters from Dr. Menta to IUP discussing plaintiff's impairment are sufficient evidence to establish that plaintiff was substantially limited in the major life activity of thinking. The Court is also satisfied that plaintiff has established that she is a "qualified individual" within the meaning of the Act.

Plaintiff now must establish that she suffered an adverse employment action because of her disability to make her *prima facie* case. The Third Circuit has held that failure to engage in what has come to be known as the "interactive process" in determining an appropriate reasonable accommodation for a disabled employee is an adverse employment action. "An employer commits unlawful disability discrimination under the ADA if he/she 'does not make reasonable accommodations to the known physical or mental limitations of an [employee who is an] otherwise qualified individual with a disability.'" *Conneen v. MBNA America Bank*, 334 F.3d 318, 325 (3d Cir. 2003) (citing 42 U.S.C. § 12112(b)(5)(A)). A reasonable accommodation

requires that steps be taken to "enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(ii). "'Reasonable accommodation' further 'includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith,' *Mengine v. Runyon*, 114 F.3d 415, 416 (3d Cir. 1997), under what has been termed a duty to engage in the 'interactive process . . .'" *Williams*, 380 F.3d at 761.

"To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Taylor*, 184 F.3d at 319-320 (citations omitted).

It is not disputed that IUP was aware of plaintiff's disability or that plaintiff requested accommodations for her disability. Plaintiff asserts that IUP failed to engage in the required interactive process. IUP repudiates this contention.

"Employers can show that they have met their duty to make a 'good faith effort to seek accommodations' by taking steps including the following: 'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered the employee's request, and offer and discuss available alternatives when the request is too burdensome." *Kennelly v. Pennsylvania Turnpike Commission*, 208 F.Supp.2d 504, 515 (E.D.Pa. 2002) (quoting *Taylor*, 184 F.3d at 317).

The evidence of record shows IUP's willingness to engage in the interactive process. IUP demonstrated a willingness to meet with plaintiff to discuss a reasonable appropriate accommodation, and in fact, did meet with plaintiff to do so after the first meeting was scheduled, re-scheduled, then cancelled by plaintiff. IUP requested medical information several times from plaintiff and plaintiff's then counsel to determine the extent of her disability and the appropriateness of a reasonable accommodation. IUP was aware, by virtue of plaintiff's letter

16

attachment to her ADA Accommodation Request Form, what plaintiff specifically wanted. IUP demonstrated a continuing willingness to consider employee's request once the medical information they asked for was received. Further, it appears IUP would have been willing to discuss alternatives once the requested information arrived.

Plaintiff challenges IUP's request for medical records as part of the interactive process, alleging that it placed an impermissible precondition on engaging in the interactive process. The Court disagrees. The request for information itself was part of the interactive process. "Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Taylor*, 184 F.3d at 315.

Plaintiff never provided the medical documentation that IUP repeatedly requested. Moreover, plaintiff never offered an explanation as to why the information could not or would not be produced. Neither did plaintiff provide a suitable substitute for the information elicited. "Participation is the obligation of both parties . . . so an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals." *Taylor*, 184 F.3d at 317. That is precisely what happened here. Plaintiff can not prevail on her failure to make a reasonable accommodation claim because she was the party responsible for the breakdown of the interactive process. *See, e.g., Conneen*, 334 F.3d at 329. Therefore, summary judgment will be granted to defendants on Count III of plaintiff's first amended complaint.

Count IV of plaintiff's first amended complaint claims retaliation against IUP and Dean Camp in violation of the PHRA. Because the analysis of plaintiff's retaliation claim in violation of the ADA applies equally to the PHRA claim, see, e.g., *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 979 n. 1 (3d Cir. 1998) ("Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts, among them the ADA"), summary judgment will be granted to defendants on Count IV of plaintiff's first amended complaint pursuant to the analysis advanced above.

V. **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment shall be granted, and the case dismissed with prejudice. An appropriate order will follow.

By the court:

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc: David S. Dessen, Esq.
Dessen, Moses & Rossitto
600 Easton Road
Willow Grove, PA 19090

Brian P. Gabriel, Esq.
Campbell, Durrant & Beatty, P.C.
555 Grant Street, Suite 310
Pittsburgh, PA 15219